Matthew S. Warren (State Bar No. 230565)
Erika H. Warren (State Bar No. 295570)
Jiaxing Xu (State Bar No. 344100)
WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
26-11898@cases.warrenllp.com

*Attorneys for Plaintiff Benchling, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENCHLING, INC.;<br><br>Plaintiff;<br><br>v.<br><br>NITHIN PARSAN; DAVID LI; HB 383, LLC; and ARCX BIO LLC;<br><br>Defendants. | Case No. ____________<br><br>**COMPLAINT FOR:**<br><br>**1. TRADE SECRET MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836, ET SEQ).**<br>**2. BREACH OF CONTRACT**<br>**3. CONVERSION**<br>**4. RESTITUTION**<br>**5. BREACH OF DUTY OF LOYALTY**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Benchling, Inc. files this action against Defendants Nithin Parsan, David Li, HB 383, LLC, and ArcX Bio LLC, and alleges as follows:

## INTRODUCTION

1. This action seeks to protect Benchling's hard-earned and expensive confidential and proprietary information, including its trade secrets. Benchling is the market leader for software supporting research and development in life sciences. Using its years of experience and the resulting knowledge it gathered, Benchling identified an opportunity in training artificial intelligence models, and built products to meet this need. Benchling's products were successful. Unfortunately for Benchling, defendants in this action have sought to steal this success, by violating their agreements with Benchling, misappropriating Benchling's trade secrets, and using these violations to set up a new company that would sell Benchling's successful products, but with the profits flowing to defendants.

2. Unfortunately for defendants, in doing so they left a trail of evidence. Defendant Nithin Parsan constantly texted from his company-issued laptop, leaving a record of defendants' malfeasance for Benchling to find. Defendant Parsan's text messages confirm that, shortly after they met, defendants Parsan and David Li worked together to found a new company, defendant ArcX Bio LLC, seek investment from venture capital firms, and seek to sell Benchling's products as their own. In the text messages, defendants repeatedly note that they will leave Benchling just as soon as they get their ArcX off the ground, and repeatedly gloat about how much money they will make when they do.

3. All of this was improper. The law does not allow defendants to steal Benchling's hard work and then profit from it. This action seeks to enforce the law, to hold defendants accountable for their wrongful acts, and to prevent them from causing further harm to Benchling.

## THE PARTIES

4. Plaintiff Benchling, Inc. ("Benchling") is and was at all relevant times a Delaware corporation with its principal place of business in San Francisco, California.

5. Defendant Nithin Parsan ("Parsan") is and was at all relevant times a resident of San Francisco, California.

6. Defendant David Li ("Li") is and was at all relevant times a resident of San Francisco, California.

7. Defendant HB 383, LLC (“HB 383”) is and was at all relevant times a California limited liability company with its principal place of business in San Francisco, California. Defendant Li is and was at all relevant times the sole member of HB 383. On information and belief, Defendant HB 383 is and was at all relevant times an alter ego of Defendant Li.

8. Defendant ArcX Bio LLC (“ArcX”) is and was at all relevant times a California limited liability company with its principal place of business in San Francisco, California.

## JURISIDICTION

9. This civil action involves trade secret misappropriation by all defendants under the Defend Trade Secrets Act, 18 U.S.C §§ 1836, *et seq*.

10. This Court has federal question subject matter jurisdiction over this action under 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.

11. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims because they are related to the federal claims in this action, and form part of the same case or controversy under Article III of the United States Constitution.

12. This Court has personal jurisdiction over defendants Parsan and Li, residents within this District, under at least Fed. R. Civ. P. 4(k)(1)(A) and California Code of Civil Procedure § 410.10.

13. This Court has personal jurisdiction over defendants ArcX and HB 383, California limited liability companies with their principal places of business in this District, under at least Fed. R. Civ. P. 4(k)(1)(A) and California Code of Civil Procedure § 410.10.

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because all defendants are California residents and residents of this District, and under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in this District, and a substantial part of property that is the subject of the action is situated in this District.

## DIVISIONAL ASSIGNMENT

15. Under Civil Local Rules 3-2 and 3-5 and General Order No. 44, this case concerns intellectual property rights and the Clerk should therefore assign it on a district-wide basis.

//

//

## BACKGROUND

### A. Benchling's Mission to Unlock the Power of Biotechnology

16. Benchling's mission is to unlock the power of biotechnology by helping scientists unite data, automation, and artificial intelligence to bring new products and discoveries to life. Benchling's founders Sajith Wickramasekara and Ashu Singhal, having worked in academic labs, saw that while biology was advancing rapidly, the software supporting it wasn't. Biotechnology scientists lacked modern and collaborative software for designing biological molecules, documenting experiments, and sharing research findings. Benchling's founders had a vision for a unified platform that would allow researchers to organize complex scientific data, collaborate more effectively, and accelerate the discovery and development of new medicines and other clinical products. To meet this vision, Benchling built the first cloud platform designed for modern life sciences research and development, bringing data, workflows, and teams together in one place.

17. Benchling invested substantial time and millions of dollars in developing its technologies and products. Benchling expanded its software platform into an integrated research and development environment. It developed cloud-based applications for electronic laboratory notebooks, biological data management, experimental workflows, automation, and scientific analytics, with the goal of connecting previously fragmented research activities and reducing the administrative burdens on scientists. For example, in the field of drug discovery and development, Benchling helps biopharmaceutical companies identify promising therapeutic candidates, accelerate discovery, and advance those candidates through development with greater scientific insight and operational efficiency. Benchling enables researchers to design and analyze biological molecules, including DNA, RNA, and proteins; capture and connect experimental data; and use analytics and artificial intelligence to identify patterns, evaluate results, and inform decisions about which candidates to advance. And Benchling integrates with other companies, tools, and products, including scientific models, lab automation platforms, data connectors, and contract research organizations. Scientists use contract research organizations to perform outsourced services for various purposes, including for the production of physical products such as DNA fragments, creation of data such as antibody assay data, and many other activities.

//

18. More than 1,300 organizations, from emerging startups to global enterprises, trust Benchling to accelerate their most important work. Benchling's customers span biopharmaceutical, agriculture, materials, and other fields transforming the world through biology.

**B. Benchling Develops Trade-Secret Products to Assist Training of AI Models**

19. As an AI-forward company, Benchling is always looking for ways to improve the training and performance of AI models, which in turn can help scientists improve their research. Although AI models have improved substantially at many functions such as those relating to software engineering, their abilities to assist with life sciences tasks lags behind. For example, one basic building block of a scientific study is the protocol, which functions like a recipe, specifying which steps to perform, how to perform them, and in what order. Adapting a published scientific protocol to a new experiment is a routine task for a wet-lab scientist, but not for an AI model. Scientists routinely troubleshoot, modify, and optimize published wet lab protocols to match real world conditions, but AI models often fall short. The models may provide answers that sound sensible but miss how experiments may behave in practice. In a recent paper by Benchling scientists, including defendant Parsan, Benchling published the "BenchBench-Protocol," a benchmark for comparing AI models' skills at this basic biotechnology task. The best models solve just under 60% of these tasks on the first try and most other models pass less than half of the time, leaving plenty of room for improvement. AI models do not struggle only regarding scientific protocols; they need improvement in many other areas of life sciences, including cloning, experimental decisions, program decisions, and computational analysis.

20. Benchling is uniquely suited both to understand the flaws in current models, and to assist in training better models in the future. Benchling sees real-world use cases in life sciences through its broad customer base, builds its own Benchling AI product, and constantly evaluates its performance on life sciences tasks. Benchling hears feedback from its customers on its AI features and use cases for them. Using this information and experience, Benchling has developed a trade-secret understanding of where AI models need improvement. To assist in this improvement, Benchling developed proprietary products that provided life science data in a manner beneficial to AI model training. Benchling's proprietary model learning products used trade-secret methods of enhancing scientific data to improve the results of AI training and thus the resulting AI models. Benchling established relationships with customers building AI

models; the customers tested Benchling's products and reported positive results. Benchling sold its proprietary model learning products to customers building AI models, using trade-secret pricing.

21. All of this information, including Benchling's understanding of where current models need improvement, Benchling's understanding of how to develop products providing life science data in a manner beneficial to AI model training, Benchling's understanding of how much to charge for these products, and Benchling's understanding of who to sell these products to, is not published anywhere or known to anyone other than Benchling.

**C. Benchling Protects Its Proprietary, Confidential and Trade Secret Information**

22. Benchling protects its confidential and proprietary information, including its trade secrets, ensuring that no one unauthorized to receive it does so, and that everyone authorized to see this information keeps it secret.

23. For example, before receiving any confidential information from Benchling, Benchling employees must execute a Confidential Information and Invention Assignment Agreement in which they agree, among other things, that they "understand and acknowledge that my work as an employee of the Company will involve access to and/or creation of confidential, proprietary, and trade secret information of the Company," that Benchling "and its customers, vendors, suppliers, consultants, contractors or business associates have developed, compiled, and otherwise obtained this Proprietary Information often at great expense, and that such information has great value to their respective businesses," and to "<u>agree at all times to hold in the strictest confidence and in trust for the sole benefit of the Company, and to the extent it relates to such third parties, its customers, vendors, suppliers, partners, consultants, contractors or business associates, each and all of the Proprietary Information</u>." Ex. 1 § 1.1 (emphasis in original). Employees must further "recognize that nothing in this Agreement is intended to limit any rights or remedies the Company may have under the Uniform Trade Secrets Act or other applicable laws in any jurisdiction, all of which are reserved by the Company, and that I could face possible criminal and civil actions, including imprisonment and monetary liability, if I misappropriate the trade secrets of the Company or its customers, vendors, suppliers, consultants, contractors or business associates." *Id.* § 11.

24. Similarly, before receiving any confidential information from Benchling, independent contractors for Benchling must execute an Independent Contractor Agreement, in which they agree,

among other things, that they "may have access to information not generally known to the general public or within the industry in which the Company is engaged, concerning, among other things, the Company's business methods, presentations, clients, services, business strategies, marketing, sales pitches, and related matters," that they "agree[] and understand[] that the Company has expended substantial time, effort, energy, and money in developing its Confidential Information, and that the Company's Confidential Information is vital to its business operations," that they agree "to refrain from directly or indirectly transferring, possessing, using, or disclosing by any manner any Confidential Information, other than necessary in carrying out Independent Contractor's duties, without first obtaining the prior written approval of the Company," and that "disclosure of the Company's Confidential Information" without authorization "will be subject to substantial damages, including punitive damages and attorneys' fees." Ex. 2 §§ 4.a, 4.b, 4.d.

25. In addition, Benchling's employee handbook states that "employees must not use or disclose any Proprietary, Confidential, or Personal Information they produce or obtain during employment with the Company, except to the extent such use or disclosure is required by their jobs. This obligation remains even after an employee's employment relationship with the Company ends." The handbook further states that "[e]mployees are expected to keep Proprietary and Confidential Information secure from outside visitors and all other persons who do not have legitimate reason to see or use such information," and that "[e]mployees are not to remove Company property without authorization." The handbook also contains Benchling's Secure Desk Policy, which states that:

1. Employees are required to secure all sensitive/confidential information in their workspace at the conclusion of the work day and when they are expected to be away from their workspace for an extended period of time. This includes both electronic and physical hardcopy information.
2. Computer workstations/laptops must be locked (logged out or shut down) whenever left unattended (including for brief periods such as lunch, bathroom breaks, and meetings) and at the end of each work day. Portable devices like laptops and tablets that remain in the office overnight must be shut down and stored away.
3. Mass storage devices such as CD, DVD, USB drives, or external hard drives must be treated as sensitive material and locked away when not in use.
4. Printed materials must be immediately removed from printers or fax machines. Printing physical copies should be reserved for moments of absolute necessity. Documents should be viewed, shared and managed electronically whenever possible.

5. All sensitive documents and restricted information must be placed in the designated shredder bins for destruction, or placed in the locked confidential disposal bins. Please refer to the Records Retention Policy for additional information pertaining to document destruction.

6. File cabinets and drawers containing sensitive information must be kept closed and locked when unattended and not in use.

7. Passwords must not be written down or stored anywhere in the office.

8. Keys and physical access cards must not be left unattended anywhere in the office.

The handbook further states that "Employees shall not use the Company's Technology Resources for any illegal purpose, in violation of any Company policy, in a manner contrary to the best interests of the Company, in any way that discloses Confidential or Proprietary Information of the Company or third parties, or for personal or pecuniary gain."

In addition to these policies, Benchling has many other policies protecting its confidential and proprietary information, including its trade secrets. For example, Benchling does not reveal confidential and proprietary information, including its trade secrets, to any counterparty without an agreement protecting that information and preventing the counterparty from engaging in unauthorized use of Benchling's confidential and proprietary information, including its trade secrets.

**D. Defendants Parsan and Li Agreed That Benchling Owns Their Work and Its Results**

26. Defendants Parsan and Li agreed that Benchling owns their work for Benchling and the results of that work. Before receiving any confidential information from Benchling, defendant Parsan executed a Confidential Information and Invention Assignment Agreement which contained the provisions discussed above, and which further provided that:

> I agree that the Company and its successors or assigns shall be the sole and exclusive owner, in perpetuity and throughout the universe, of any and all Intellectual Property and any and all patents, copyrights, works of authorship, moral rights (defined as all paternity, integrity, disclosure, withdrawal, special and any other similar rights recognized by the law of any jurisdiction or country), trademarks, service marks, logos, trade dress, database rights, trade secrets, and other proprietary information rights, contract rights, goodwill, and other intellectual property rights or intangible rights or claims with respect to any of the foregoing, and any and all improvements or modifications to or derivative works of any of the foregoing, whether or not subject to patent or copyright or other protection and in any state of development or form or media, that have been or will be conceived, developed, reduced to practice or authored by me alone or with others (i) during the entire term of my employment or engagement, whether or not conceived or developed during regular business hours, and

//

> whether or not conceived before, on, or after the date hereof; or (ii) at any time after termination of my employment or engagement, if based on or incorporating or referencing any of the Proprietary Information or Third Party Information to any extent (collectively "Inventions"), free of any claims by me or any related persons or entities.
>
> I hereby irrevocably assign and transfer to the Company and its successors and assigns, without additional consideration, all right, title and interest throughout the universe in and to each and all of the Inventions in perpetuity. Such assignment and transfer shall be deemed made by me in each case as of the time of the conception, development, or reduction to practice of the subject Invention on a continuous basis. I also agree to sign and deliver additional documents if and as requested by the Company or its successors or assigns to confirm such assignment and transfer.

Ex. 1 §§ 4.1, 4.2. Defendant Parsan's agreement further stated: "I acknowledge that, during my employment with the Company, I owe both a duty of loyalty and, if I am an officer of the company who participates in management, a fiduciary duty to the Company, and such duties prohibit me from (1) engaging in any business activity that is or may be competitive with, or that would otherwise conflict with, my employment with the Company and (2) from assisting any other person or entity in competing with the Company or in preparing to engage in competition with the business or proposed business of the Company, in either case at all times while I remain employed by the Company." Ex. 1 § 7.1.

27. Similarly, before receiving any confidential information from Benchling, defendant Li executed an Independent Contractor Agreement through his company HB 383, which contained the provisions discussed above, and which further provided that:

> Independent Contractor hereby acknowledges the great value and goodwill of the Company's copyrights, trademarks, logos and other intellectual property, including, without limitation, all of its product designs and promotional materials (collectively, "Intellectual Property"). Independent Contractor acknowledges that the Company is the sole owner of all right, title and interest to the Intellectual Property. Independent Contractor agrees not to detract from or challenge any of the Company's rights in the Intellectual Property.
>
> As used herein, the term "Work Product" shall include, without limitation, all materials, software, tools, data, inventions, ideas, creations, technology, designs, works of authorship and other innovations of any kind, and any related work-in-progress, improvements or modifications to the foregoing, that are created, developed or conceived (alone or with others) in connection with Independent Contractor's activities for the Company, including, without limitation, any deliverables under this Agreement, that Independent Contractor, or personnel working for or through Independent Contractor, may make, conceive, develop or reduce to practice, alone or jointly with others, in the course of performing the Contracted Services or as a result of such Contracted Services, whether or not eligible for patent, copyright, trademark, trade secret or other legal protection. Ind ependent Contractor hereby irrevocably assigns and agrees to assign to the Company, without additional consideration, all right, title

> and interest in and to all Work Product, without limitation, all copyrights, trademarks, trade secrets, patents, industrial rights and all other intellectual property and proprietary rights related thereto, effective immediately upon the inception, conception, creation or development thereof. Independent Contractor shall (a) disclose promptly to the Company all Work Product, and (b) whether during or after the period of this arrangement with the Company, execute such written instruments and do such other acts as may be necessary in the opinion of the Company to obtain a patent, register a copyright or otherwise evidence or enforce the Company's rights in and to such Work Product (and Independent Contractor hereby irrevocably appoints the Company and any of its officers as its attorney in fact to undertake such acts in its name).

Ex. 2 §§ 5.a, 5.b (emphasis in original).

**E. Relying on Their Agreements to Keep Its Information Confidential, Benchling Shares Its Proprietary, Confidential and Trade Secret Information With Defendants Parsan and Li**

28. Relying on their agreements to keep Benchling's information confidential, Benchling shared its confidential and proprietary information, including its trade secrets, with defendants Parsan and Li, including the information discussed above. Benchling shared this information on a strictly confidential basis and retained ownership of this information, including under the agreements discussed above.

29. In addition, defendant Parsan and defendant Li worked on and added to Benchling's confidential and proprietary information, including its trade secrets, including for example the information discussed above. Again, Benchling shared this information on a strictly confidential basis and retained ownership of this information, including under the agreements discussed above.

30. On April 22, 2026, defendant Parsan started as a Benchling employee. Defendant Parsan's responsibilities included managing Benchling's proprietary model learning products and selling those products to customers building AI models using Benchling's trade-secret relationships and pricing for selling those products.

31. On May 1, 2026, defendant Li started as a Benchling independent contractor. Defendant Li's responsibilities included managing acquisitions of information used to develop Benchling's proprietary model learning products, including Benchling's trade-secret relationships and pricing for buying that information.

32. On May 6, 2026, a colleague at Benchling introduced defendants Parsan and Li.

//

//

### F. Defendants Parsan and Li Work Together to Steal Benchling's Proprietary, Confidential and Trade Secret Information, and Use It to Establish Defendant ArcX, Which They Develop as a Competitor to Benchling, Using Benchling's Stolen Information

33. Defendants Parsan and Li did not honor their obligations to Benchling.

34. Instead, defendants Parsan and Li realized that defendant Parsan had access to Benchling's trade-secret model learning products, its processes for building and improving these products, and its trade-secret relationships and pricing for selling those products, while defendant Li had access to Benchling's trade-secret understanding of the information most valuable to developing Benchling's model learning products, as well as Benchling's trade-secret relationships and pricing for buying that information. In short, defendant Li understood the inputs and part of the pipeline, and defendant Parsan understood the rest of the pipeline and the outputs. Together, they thought, they didn't need Benchling.

35. As long as they violated their agreements, of course, but they were willing to do that. So defendants Parsan and Li worked together to steal Benchling's confidential and proprietary information, including its trade secrets, including for example the information discussed above. Defendants Parsan and Li planned to use Benchling's confidential and proprietary information, including its trade secrets to found and operate defendant ArcX, which defendants Parsan and Li planned as a competitor to Benchling, using Benchling's stolen confidential and proprietary information, including its trade secrets.

36. Unfortunately for defendants, they did not cover their tracks.

37. In particular, defendant Parsan texted several contacts about his plan—and did so from his Benchling company computer, thus preserving his incriminating texts in Benchling's records.

38. Just one month after a colleague at Benchling introduced defendants Parsan and Li, defendant Parsan's text messages confirmed that he was actively seeking to set up his own business using Benchling's confidential and proprietary information, including its trade secrets. On July 6, 2026, defendant Parsan texted with a contact with the email handle "joexmo":

> Parsan: also, things have progressed on the data side! we're trying to dial in a pitch ahead of a meeting with [Benchling customer]. Are you on Signal btw? I want to introduce you to David (https://www.linkedin.com/in/david-li-9aa210b/) and find a time for us three to chat tomorrow / Tuesday. For context, I mentioned to him that you were interested on the infra / FDE side.
>
> Parsan: We should find a time to chat too ahead, will share some context and the working doc.
>
> Parsan: Are you free at 7:30 pm eastern time today?

Joexmo: I used to be in the Harvard Commons Signal, haven't been on there since but you can add this number! Im super free tonight and could even do earlier too, just let me know whenever you wake up and are ready

Joexmo: Loved "also, things have progressed on the data side! we're trying to dial in a pitch ahead of a meeting with [Benchling customer]. Are you on Signal btw? I want to introduce you to David (https://www.linkedin.com/in/david-li-9aa210b/) and find a time for us three to chat tomorrow / Tuesday. For context, I mentioned to him that you were interested on the infra / FDE side."

Joexmo: Oh awesome!! I know David from twitter, he doesn't know me though haha

Joexmo: He's at benchling now?

Parsan: Liked "I used to be in the Harvard Commons Signal, haven't been on there since but you can add this number! Im super free tonight and could even do earlier too, just let me know whenever you wake up and are ready"

Parsan: cool cool! will give u a ring tom morning around 7:30 eastern :)

Parsan: Emphasized "Oh awesome!! I know David from twitter, he doesn't know me though haha"

Parsan: yea his tweets are great! he's working w me as a consultant on the data deals we do w biotech companies

Similarly, on July 29, 2026, defendant Parsan texted with a contact with area code "617" and a phone number ending in "7059":

Parsan: got a crazy opp to pitch [Benchling customer] to build out their experimental infrastructure to make drugs

7059: WHOA

7059: BIG MONEY

7059: YO

Parsan: yea it works it's huge

7059: aight we gotta catch up soon

Parsan: would leave and raise $

On August 1, defendant Parsan texted with a contact with area code "610" and a phone number ending in "3500" about defendants' upcoming meeting with a venture capital firm that invests in life sciences companies:

3500: When are you coming again? Aug 3? Do you have time for dinner?

3500: Ok ok

3500: Wanna do monday dinner?

Parsan: might not be able to do dinner i'll try to come hang tho

3500: Ok, yeah just keep me in the loop

Parsan: i'll give u the rundown but tldr is a ex biotech guy and i are thinking about a startup

3500: Lmao

Parsan: we have a full partner meeting w [venture capital firm] on tues morning 8 am

3500: Ah ok

Parsan: and then a pitch w [Benchling customer] for a high 7 figs contract on wed

//

Parsan: 50% chance it works out
3500: So u r hopping again?
Parsan: LOL
Parsan: i mean if it works out yea
3500: Or like same spot
3500: Ok ok
Parsan: would be p generational
3500: I won't say anything
Parsan: ofc
Parsan: [Friend] is aware haha
3500: ahahha
Parsan: but no one else rlly
Parsan: well i think its more
3500: Loved "would be p generational "
Parsan: like by end of Q1 our target for the data business is 100M RR
Parsan: and margins are p high

These texts confirm that defendants Li and Parsan were working together; that they were looking for investment from venture capital firms; and that they were meeting with customers building AI models, seeking to sell those customers Benchling's confidential and proprietary information, including its trade secrets, and that they planned to leave Benchling, but not until the ink was dry on their resulting deals.

39. Defendants' meeting with the venture capital fund occurred sometime between August 1 and August 4, 2026. On August 4, defendant Parsan texted with a friend about that meeting:

Parsan: ok tldr for [venture capital fund] is
Parsan: they 1. want me to leave benchling as fast as possible and are worried about issues there
Parsan: 2. they want to merge the clinical entity in
Parsan: the advantage is that they did already basically nudge the [Benchling customer] team (bc it's their portco [portfolio company]) that got acquired and told us what they're looking for, and our pitch aligns with it
Parsan: so there's a game theory where they may backchannel, get [Benchling customer] to hinge the deal on [Benchling customer] owning equity + a lead investor joining (which would then have to be [venture capital fund])
Parsan: now the counter we have here is that that team isn't *that* close with [venture capital fund] so their leverage isn't that high, so if they really like us we're good

In this series of texts, defendant Parsan confirmed that he and defendant Li were already looking for investment and talking to venture capital firms, and that at least one of those venture capital firms had expressed discomfort about the "issues there" surrounding defendants Parsan and Li's confidential relationship with Benchling.

//

40. Undeterred by this warning from the venture capital fund, defendants continued to pitch Benchling's customers. On August 5, 2026, defendant Parsan texted regarding one such meeting with a contact with area code "617" and a phone number ending in "5834":

Parsan: holy f[***] dude
Parsan: it was like a top 5% outcome
Parsan: chance it works out is like 95%
Parsan: not to jinx anything
Parsan: tldr is they're totally aligned w what we proposed, had a verbal yes, we're sending over one-pager for them to run by corp dev but that should go through
Parsan: they said yes to $5 but we'll do a two for one deal and try to get them on $9 lol (also pls dont' discuss w anyone lmao )
Parsan: and yea if that goes well they'd want to scale exponentially
Parsan: [Benchling's contact at Benchling customer] also likes me bc he was familiar w the work i did w their team / envs i sold to them and we did a v good job w that
Parsan: so he knows i can deliver on this in a tight timeline
Parsan: if they do 5 we'd get at least 3 profit if they do 9 then closer to 7.5
5835: [Benchling customer] said?
5835: but didn't [venture capital fund] try to sell you that you need then?
5835: them?
Parsan: Disliked "but didn't [venture capital fund] try to sell you that you need then?"
Parsan: that's our proposal ya they agreed verbally, need to get things signed
Parsan: and see what option they choose
5835: so you will try without [venture capital fund]?
Parsan: nah they dgaf

In this series of texts, defendant Parsan confirmed the specific details regarding his pitch to Benchling's contact at a Benchling customer.

41. On August 8, 2026, defendants Parsan and Li founded defendant ArcX.

42. On August 28, 2026, defendant Parsan texted with a contact "Alicia," and confirmed his and defendant Li's plan to leave Benchling to Alicia, who thought that he had already left:

Alicia: where are you working out of rn
Parsan: like rn? benchling office
Alicia: ahh i thought you left al
Parsan: oh no we're waiting a bit
Parsan: we wanna wait until the [Benchling customer] thing is papered bc they might be slow
Parsan: and we also have a lot of extant contracts here i need to make sure we do well
Alicia: i forgot who i met recently but they were selling bio data to labs
Parsan: many are now lol
Parsan: if u rmr lmk who tho i'd love to chat w them

//

In this exchange, defendant Parsan confirmed that he and defendant Li already planned to leave Benchling, but were "waiting a bit," at least in part so that they could confirm that "the [Benchling customer] thing is papered," that is, that defendant ArcX had a deal with the Benchling customer, which defendant Parsan approached through Benchling's relationship contact. Finally, he greets the idea of "selling bio data to labs"—ArcX's business plan—with a "lol" and a desire to make more contacts in this area.

43. On August 31, 2026, defendant Li texted defendant Parsan and a contact "Lyna": "Nithin and I were discussing a few ways that might make our vision / case study concrete for [Benchling customer]'s objectives in landing in pharma; we put a few thoughts below - no huge rush at all but maybe food for thought when you have a chance." Defendant Li texted a link to a Google Doc. On September 9, defendant Li texted defendant Parsan and "Lyna" a link to a Google Doc, followed by the text: "Hey lyna so good seeing you! Here's a few files updated for mtg tmrw: i) original demo video for ArcX ii) program two pager (Lyna version) iii) demo video re: budgeting iv) demo video re: CRO mgmt v) slides showing intro ArcX and 12 week case study." Although Benchling does not have access to the Google Docs referenced in these text messages, the text messages themselves confirm that defendants Li and Parsan were well down the path of setting up and promoting ArcX.

44. On September 10, "Lyna" texted defendants Li and Parsan, and had the following dialogue:

Lyna: One thing that's hopefully fast to add is a rough breakdown of use of funds for the $5m? Can be super broad here
Li: Yep can def add this afternoon
Lyna: I wouldn't imagine it as a ceiling to our budget but helpful to give a sense
Lyna: awesome
Li: Liked "I wouldn't imagine it as a ceiling to our budget but helpful to give a sense "
Lyna: Also one question for you guys is, are you getting enough out of this structure?
Lyna: Want to make sure that this is setting you up well
Lyna: & I think general principle is we want everyone to feel compensated well so incentives are aligned to full send together lol
Li: Lol that's good to hear, we like aligned incentives as well 👍
Li: Pretty candidly with this structure we would make ok to decent margin (but majority of budget would go to actual experimental spend) - I guess how we thought about it was let's quickly get to whatever is "sweet spot" on signoff so as to get things going (we really really think speed is going to be key to catalyzing the entire movement); and then if we can get visibility on what "success" looks like in terms of ramping from here - then I think that would be ideal for us
Li: Definitely open to input on how to navigate that best though 😃

//

In this exchange, defendant Li confirmed that they were asking for $5 million in investment, and that "speed is going to be key to catalyzing the entire movement."

45. Defendant Li's term at Benchling ended on September 4, 2026.

46. Defendant Parsan remained a Benchling employee until Benchling terminated him for misconduct on September 19, 2026. Before returning his company laptop, defendant Parsan appears to have deleted some of his browser history.

47. Defendants continue to misuse Benchling's confidential and proprietary information, including its trade secrets. Defendants continue to pitch Benchling's customers, seeking to sell Benchling's proprietary model learning products, and continue to seek investments from companies based on their ability to sell Benchling's proprietary model learning products. Defendants' misconduct will continue to harm Benchling until the Court requires them to stop.

## COUNT I

*Federal Trade Secret Misappropriation*

*Under the Defend Trade Secrets Act (18 U.S.C. §1836 et seq.)*

*(Against All Defendants)*

48. Benchling repeats and realleges the allegations above as is fully set forth herein.

49. Based on its substantial investment in research and development, as well as its industry and business experience, Benchling owns valuable confidential and proprietary information, including trade secrets under 18 U.S.C. § 1839(3).

50. Benchling engages in considerable effort to keep its confidential and proprietary information, including its trade secrets, secret and protected. Benchling's contractual measures, onboarding and training measures, and security and surveillance protocols all ensure reasonable measures are in place. And Benchling has not authorized the disclosure or use of any of its confidential and proprietary information, including its trade secrets, by any current or former Benchling personnel other than within his or her job scope and duties.

51. Benchling's confidential and proprietary information, including its trade secrets, derive independent economic value, actual or potential, from not being generally known to, or readily

//

ascertainable through proper means by, others who can obtain economic value from the disclosure or use of the information.

52. On information and belief, defendants Li, HB 383, and Parsan improperly acquired and then misappropriated Benchling's confidential and proprietary information, including its trade secrets, through improper and unlawful means, and did so intentionally, willfully, and maliciously. On information and belief, defendants Li, HB 383, and Parsan further misappropriated Benchling's confidential and proprietary information, including its trade secrets, to defendant ArcX.

53. On information and belief, defendant ArcX misappropriated Benchling's confidential and proprietary information, including its trade secrets, and presents an ongoing threat of further misappropriation of those secrets because ArcX knew, or had reason to know, that its acquisition of Benchling's confidential and proprietary information, including its trade secrets, was facilitated by the other defendants by improper means.

54. On information and belief, defendant ArcX is liable for defendant Li and Parsan's misappropriation of Benchling's confidential and proprietary information, including its trade secrets, under the doctrine of respondeat superior because defendant ArcX knew or should have known of the misappropriation and did nothing to prevent or stop it.

55. On information and belief, defendants derived economic value through their misappropriation and unauthorized use of Benchling's confidential and proprietary information, including its trade secrets.

56. On information and belief, if not enjoined, defendants have misappropriated and will continue to misappropriate Benchling's confidential and proprietary information, including its trade secrets, for their own benefit and to the detriment of Benchling.

57. Benchling has suffered and will continue to suffer damages in an amount to be proven at trial. If defendants are not enjoined from further breaches, Benchling will suffer irreparable and severe harm and injury, including in the form of lost business opportunities and disclosure of confidential and trade secret information to third parties.

58. On information and belief, because defendants' misappropriation was intentional, willful, and malicious, Benchling is entitled to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) in an amount

equal to two times the amount of its compensatory damages as well as reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

59. Benchling's remedy at law is inadequate. As a result, Benchling is entitled to, in addition to damages, injunctive relief under 18 U.S.C. 1836(b)(3)(A) against defendants' further misappropriation and to protect Benchling's confidential and proprietary information, including its trade secrets, its goodwill and standing in the competitive marketplace, and its legitimate and legal business interests.

**COUNT II**

*Breach of Contract (Against Defendants Li, Parsan and HB 383)*

60. Benchling repeats and realleges the allegations above as is fully set forth herein.

61. Defendants Li, Parsan and HB 383 executed contracts with Benchling, including employment contracts, Confidential Information and Invention Assignment Agreements, and Independent Contractor Agreements.

62. Benchling substantially performed under each of its contracts with defendants, including by paying compensation to defendants.

63. Each of the contracts between defendants and Benchling require, among other things, defendants to access Benchling's confidential and proprietary information only for the purposes of fulfilling their duties to the company, to protect and keep Benchling proprietary information confidential and not to use or disclose it without permission, and to return all of Benchling's confidential and proprietary information upon termination.

64. On information and belief, defendants Li, Parsan and HB 383 breached and continue to breach their contracts with Benchling by improperly accessing, misusing, misappropriating, disclosing, transferring, or failing to return Benchling's confidential and proprietary information and by using Benchling's confidential and proprietary information to found ArcX, and sharing Benchling's confidential and proprietary information with potential investors in and customers of ArcX.

65. Benchling did not excuse defendants' performance of these contractual obligations.

66. Benchling has suffered and will continue to suffer damages in an amount to be proven at trial. If defendants are not enjoined from further breaches, Benchling will suffer irreparable and severe

//

harm and injury, including in the form of lost business opportunities and disclosure of confidential and trade secret information to third parties.

**COUNT III**

*Conversion (Against Defendants Li, Parsan and HB 383)*

67. Benchling repeats and realleges the allegations above as is fully set forth herein.

68. Benchling has sole ownership and all right, title, and interest in its confidential and proprietary information, including information resulting or deriving from any work by Li, Parsan, and HB 383 performed on behalf of Benchling.

69. Defendants Li, Parsan and HB 383 wrongfully acquired, retained, and transferred Benchling's confidential and proprietary information, including information Benchling disclosed to defendants for the sole purpose of fulfilling their duties.

70. On information and belief, defendants Li, Parsan and HB 383 improperly transferred or used Benchling's confidential and proprietary information to their own advantage, or to the benefit of ArcX.

71. Benchling has suffered damage from the actions of defendants Li, Parsan and HB 383, and will continue to suffer irreparable harm and damage from their improper transfer and use of its confidential and proprietary information.

**COUNT IV**

*Restitution (Against Defendant ArcX)*

72. Benchling repeats and realleges the allegations above as is fully set forth herein.

73. Benchling has sole ownership and all right, title, and interest in its confidential and proprietary information, including information resulting or deriving from any work by Li, Parsan, and HB 383 performed on behalf of Benchling. Benchling allowed defendants Li, Parsan and HB 383 to access its confidential and proprietary information solely for the purposes of fulfilling their duties.

74. Benchling compensated defendants Li, Parsan and HB 383 and placed them in a position of trust including by providing them with access to confidential and proprietary information.

75. On information and belief, defendants Li, Parsan and HB 383 violated this trust and their obligations by improperly retaining Benchling's confidential and proprietary information.

76. On information and belief, defendants Li, Parsan and HB 383 improperly transferred Benchling's confidential and proprietary information to defendant ArcX. ArcX has been unjustly enriched by its improper receipt of Benchling's confidential and proprietary information, which it has used in communications with potential investors and customers, for example, to establish its credibility.

77. Benchling has suffered and continues to suffer damage from ArcX's improper receipt of Benchling's confidential and proprietary information. As a result, Benchling is entitled to a constructive trust over its confidential and proprietary information and everything derived from that information held by defendant ArcX, for the benefit of Benchling under at least Cal. Civ. Code §§ 2223 and 2224.

## COUNT V

*Breach of Duty of Loyalty (Against Defendant Parsan)*

78. Benchling repeats and realleges the allegations above as is fully set forth herein.

79. Defendant Parsan owed a duty of loyalty to Benchling.

80. Defendant Parsan breached this duty by misappropriating Benchling's proprietary and confidential information, and using such information in forming ArcX.

81. Benchling has suffered and continues to suffer damage from defendant Parsan's breach of his duty of loyalty.

## PRAYER FOR RELIEF

Benchling respectfully requests that this Court enter:

(a) a judgment in favor of Benchling and against all defendants;

(b) compensatory and exemplary damages;

(c) pre-judgment and post-judgment interest;

(d) an order enjoining defendants, any of their agents, employees, attorneys, successors and assigns, and all others in active concert or participation with them, from directly or indirectly disclosing or using Benchling's proprietary and confidential information, including its trade secrets;

(e) an order requiring defendants to return to Benchling any and all documents and information that disclose, use, or reflect in any way its proprietary and confidential information, including its trade secrets;

(f) an order establishing a constructive trust and requiring defendants to transfer legal title back to Benchling of Benchling's proprietary and confidential information, including its trade secrets, and anything resulting from any use of Benchling's proprietary and confidential information, including its trade secrets;

(g) reasonable attorneys' fees and costs;

(h) Benchling's costs and expenses in this matter; and

(i) any and all such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Benchling requests a trial by jury of all issues so triable.

Date: October 14, 2026

Respectfully submitted,

Matthew S. Warren (State Bar No. 230565)
Erika H. Warren (State Bar No. 295570)
Jiaxing Xu (State Bar No. 344100)
WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
26-11898@cases.warrenllp.com

*Attorneys for Plaintiff Benchling, Inc.*